UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILMINGTON TRUST NA, *as Trustee for the benefit of the registered holders of UBS Commercial Mortgage Trust 2017-C1, Commercial Mortgage Pass-Through Certificates, Series 2017-C1,* | § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-CV-3352-B |
| CHETANKUMAR D. PATEL and SUNITABAHEN N. PATEL, | § § § | |
| Defendants and Third-Party Plaintiffs, | § § | |
| v. | § § | |
| DATD HOLDINGS, LLC, | § § | |
| Third-Party Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Wilmington Trust, National Association's Motion for Summary Judgment (Doc. 22) and Motion for Leave to File Supplemental Affidavit in Support of its Motion for Summary Judgment (Doc. 33). As detailed below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's summary-judgment motion (Doc. 22). Specifically, the Court **GRANTS** the motion insofar as it seeks a determination that Defendants Chetankumar D. Patel and Sunitabahen N. Patel are liable for breach of guaranty, but the Court **DENIES** the motion on the issue of damages and attorneys' fees. Further, the Court **GRANTS** the motion for leave to file a supplemental affidavit

(Doc. 33).

# I.

# BACKGROUND

A.    *Factual Background*[1]

This is an action for enforcement of a guaranty. In April 2017, Plaintiff's predecessor-in-interest ("Lender") loaned Ashiyana Hospitality, LLC ("Borrower") $5,500,000. Doc. 24, Pl.'s App., 14–17. This loan ("the Loan") was documented by a promissory note ("the Note") and an agreement ("the Loan Agreement"). *See id.* at 14–17, 19–140. Under the Loan Agreement, Borrower agreed to pay Lender $5,500,000, along with interest incurred, in monthly installments through May 2027. *Id.* at 25, 37. Defendants guaranteed the Loan pursuant to a guaranty agreement ("the Guaranty"). *Id.* at 142–53.[2] Additionally, Borrower pledged the Comfort Inn Cleveland Airport Hotel ("the Hotel") and its revenue as security for the Loan. *Id.* at 155–75. Lender perfected its liens in the Hotel by filing a UCC financing statement. *Id.* at 188–95 (citations omitted). In June 2017, Lender assigned all of its rights under the Loan Agreement, the Guaranty, and associated documents to Plaintiff. *Id.* at 202–06, 208–17.[3] The Loan Agreement and the Guaranty contain choice-of-law clauses stating they are governed by and construed in accordance with Ohio law. *See id.* at 25, 92–93, 149.

Since March 5, 2020, Borrower has failed to pay the principal, interest, and reserves due

---

[1] The Court draws the facts from the parties' briefing and appendices submitted in conjunction with Plaintiff's motion for summary judgment.

[2] The Court will describe the relevant provisions of the Guaranty and the Loan Agreement in greater detail in its analysis.

[3] Lender also delivered an allonge to Plaintiff to make the Note payable to Plaintiff. *Id.* at 17.

under the Loan Agreement. Doc. 23, Pl.'s Br., 7 (citations omitted); Doc. 30, Defs.' Resp., 5 (citation omitted). Further, Borrower has incurred additional liens encumbering the Hotel without Plaintiff's consent. Doc, 23, Pl.'s Br., 7.

First, on December 20, 2017, Endison Sterling, whom Borrower had hired "to provide renovation and repair services at the Hotel," recorded a mechanic's lien due to Borrower's failure to pay Sterling ("the Sterling Lien"). Doc. 24, Pl.'s App., 219–22; Doc. 31, Defs.' App., 7. Borrower explains that because it was "unsatisfied with Sterling's work," and Sterling "walked off the job," Borrower paid him $10,000, rather than the $27,000 Sterling billed. Doc. 31, Defs.' App., 7. Plaintiff states it did not consent to the Sterling Lien, nor did it discover the Sterling Lien until August 2020. Doc. 24, Pl.'s App., 7.

Second, in February 2020, "Borrower obtained a $100,000 line of credit financing from Ascentium Capital (the 'Ascentium Financing')[.]" *Id.* According to Defendants, Borrower obtained the line of credit "to alleviate the Hotel's financial burdens related to the COVID-19 pandemic" and used all of the funds "to support the Hotel." Doc. 30, Defs.' Resp., 4 (citations omitted); Doc. 31, Defs.' App., 8. Borrower pledged the Hotel's personal property as security for the Ascentium Financing; accordingly, in February 2020, Ascentium Capital filed a UCC financing statement to reflect this security interest. Doc. 24, Pl.'s App., 224–25. Plaintiff did not discover the Ascentium Financing until August 2020. *Id.* at 8. "On September 16, 2020, Borrower paid off the full balance of the Ascentium Capital line of credit and the lien was released on September 18, 2020." Doc. 31, Defs.' App., 8 (citation omitted).

Third, in July 2020, Borrower pledged the Hotel's personal property to secure a $102,000 loan from the United States Small Business Administration ("the SBA Loan"). *See* Doc. 24, Pl.'s App.,

227–32. Consequently, the SBA filed a UCC financing statement asserting a lien on the Hotel's personal property ("the SBA Lien"). *See id.* at 227–32, 282–83. Plaintiff discovered the SBA Lien in August 2020. *Id.* at 8.

Fourth, in September 2020, Defendants—owners of Borrower's membership interests— "transferred all of their membership interests in Borrower to a third party, DATD Holdings, LLC ('DATD')[.]" *Id.*; *see also id.* at 234–41. Plaintiff did not consent or otherwise receive notice of this transfer ("the LLC Transfer"). *Id.* at 8–9. In November 2020, however, "attorneys for DATD sent a letter to [Defendants] stating that DATD considered the [LLC Transfer] to be null and void" or, alternatively, rescinded. Doc. 31, Defs.' App., 9, 121.

In light of Borrower's default on the Loan, Plaintiff sent borrower a notice of default on June 12, 2020. Doc. 24, Pl.'s App., 243–45. Under the Loan Agreement, the notice of default triggered "a Cash Management Period . . . in which all Hotel revenue received by Borrower must be deposited into a Deposit Account controlled and managed by [Plaintiff.]" Doc. 23, Pl.'s Br., 16–17 (citing Doc. 24, Pl.'s App., 26, 43). Two months after the notice of default, Plaintiff sent a notice of acceleration and demanded payment. Doc. 24, Pl.'s App., 247–49. Then, on October 27, 2020, Plaintiff sent Defendants a letter indicating that under the Guaranty, they were liable for the entire balance of the Loan. *Id.* at 251–54. Defendants have not paid Plaintiff, and Plaintiff asserts that as of the filing of its motion, Defendants owe Plaintiff $7,696,511.92 plus $62,964.78 in attorneys' fees and costs, for a total of $7,759,476.70. *Id.* at 10–11, 276.

B.    *Procedural Background*

Plaintiff filed this breach-of-guaranty suit against Defendants on November 9, 2020. *See generally* Doc. 1, Compl. About four months later, Defendants filed a motion for leave to name

DATD as a third-party defendant. Doc. 18, Am. Mot., 2. Defendants explained that due to the LLC Transfer to DATD, DATD may be liable to Plaintiff "pursuant to a contractual indemnification provision." *Id.* The Court granted Defendants' motion. Doc. 25, Mem. Op. & Order, 1.

Before the Court granted the motion for leave, however, Plaintiff filed a motion for summary judgment against Defendants (Doc. 22). After this summary-judgment motion was fully briefed, Plaintiff moved for leave to file a supplemental affidavit in support of its summary-judgment motion (Doc. 33). Now, both the motion for summary judgment and the motion for leave to file a supplemental affidavit are fully briefed. Accordingly, the Court considers both motions below.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). If the movant "bear[s] the burden of proof at trial . . . , to obtain summary judgment it must establish beyond peradventure all of the essential elements of [its] claim." *Altec Cap. Servs., LLC v. Weir Bros., Inc.*, 2013 WL 866193, at *2 (N.D. Tex. Mar. 8, 2013) (citation

omitted and cleaned up).

Once the summary-judgment movant has met this burden, the burden shifts to the non-movant to "go beyond the pleadings and designate specific facts" showing that a genuine issue exists. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). Instead, the non-moving party must "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quotation marks omitted).

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary[-]judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations incorporated) (quotations marks omitted). But the Court need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation and quotation marks omitted). If the non-movant is unable to make the required showing, the Court must grant summary judgment. *Little*, 37 F.3d at 1076.

### III.

### ANALYSIS

Below, the Court first grants summary judgment in favor of Plaintiff on its breach-of-guaranty claim. The Court then turns to the issue of damages. Although the Court grants Plaintiff's motion for leave to file a supplemental affidavit, this affidavit creates inconsistency regarding the amount Defendants owe. Thus, the Court denies summary judgment on Plaintiff's request for damages.

- 6 -

Finally, because Plaintiff failed to meet its burden of showing the reasonableness of its claimed attorneys' fees, the Court denies summary judgment as to attorneys' fees as well.

A.      *The Court Grants Summary Judgment in Favor of Plaintiff on its Breach-of-Guaranty Claim.*

Ohio law treats a breach-of-guaranty claim like a breach-of-contract claim and requires the plaintiff to show: (1) "the existence of a contract"; (2) "performance by plaintiff"; (3) "breach by defendant"; and (4) "damages." *Fifth Third Bank v. Gentile*, 2008 WL 11380021, at *2 & n.1 (N.D. Ohio Dec. 8, 2008) (citations omitted) (applying Ohio law).[4]

Here, Defendants do not dispute the existence of a contract—they acknowledge they executed the Guaranty with Plaintiff's predecessor-in-interest. Doc. 30, Defs.' Resp., 3. Further, they agree that Plaintiff's predecessor-in-interest performed under the Guaranty by loaning $5,500,000 to Borrower. *Id.* at 2. Finally, Plaintiff has presented uncontested evidence that Defendants have not paid Plaintiff any amount allegedly due under the Guaranty. Doc. 24, Pl.'s App., 11. Accordingly, Defendants concede that if they are liable under the Guaranty, Plaintiff has suffered damages. *See, e.g.*, Doc. 30, Defs.' Resp., 15 (arguing that if Defendants are liable under the Guaranty, the amount—not the existence of—damages is disputed).[5]

Thus, the only disputed issue—aside from the amount of damages—is whether Defendants have raised a genuine issue of material fact regarding their liability under the Guaranty.

Pursuant to the Guaranty, Defendants "unconditionally guarantee[d] to Lender the full,

---

[4] As noted above, the Loan Agreement contains a choice-of-law clause stating that it is governed by and construed in accordance with Ohio law to the extent it is not preempted by federal law. *See* Doc. 24, Pl.'s App., 25, 92–93. Likewise, the Guaranty is governed by and construed in accordance with Ohio law. *See id.* at 25, 149.

[5] Defendants dispute whether Plaintiff sustained damages as a result of the Ascentium Financing, but the Court rejects this argument below. *See infra* Section III.A.1.

prompt and complete payment when due of the Guaranteed Obligations." Doc. 24, Pl.'s App., 144. The "Guaranteed Obligations" include, "from and after the date that any Springing Recourse Event occurs, payment of all the Debt[.]" *Id.* at 143.

A "Springing Recourse Event" occurs where "an Event of Default described in Section 8.1(d)" of the Loan Agreement has occurred. *Id.* at 91. Under Section 8.1(d), an "Event of Default" exists when "a Transfer other than a Permitted Transfer occurs[.]" *Id.* at 81. A "Transfer" is:

> any sale, conveyance, transfer, lease or assignment, Lien, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, including forfeiture, of, on, in or affecting (i) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (ii) any direct or indirect interest in Borrower (including any profit interest), or (iii) the direct or indirect right or power to direct or cause the direction of the management and policies of Borrower, through the ownership of voting securities, by contract or otherwise.

*Id.* at 35. Permitted Transfers, on the other hand, are limited to specific types of transfers enumerated in the Loan Agreement. *See id.* at 32–33.

Another "Springing Recourse Event" is "a breach of the covenant set forth in Section 5.12" of the Loan Agreement. *Id.* at 91. Section 5.12 states, "Borrower shall at all times be a Special Purpose Entity." *Id.* at 63. Under the Loan Agreement, a "Special Purpose Entity" that owns the Hotel must have no other "indebtedness other than the Permitted Indebtedness or any prior financing that has been fully paid and discharged in full on or prior to the date" of the Loan Agreement. *Id.* at 107. Further, a "Special Purpose Entity" may not "pledge[] . . . its assets for the benefit of any other Person[.]" *Id.* at 108.

Here, Plaintiff claims multiple Springing Recourse Events triggered Defendants' liability under the Guaranty: the Sterling Lien, the Ascentium Financing, the SBA Lien, and the LLC Transfer. Doc. 23, Pl.'s Br., 23.

As explained below, the Court holds that Defendants have not created a genuine issue of material fact regarding whether the Ascentium Financing, the SBA Lien, and the LLC Transfer are Springing Recourse Events under the Loan Agreement.[6] Further, Defendants' claimed affirmative defenses do not create a genuine issue of material fact with respect to Defendants' liability under the Guaranty. Accordingly, the Court concludes Defendants are liable under the Guaranty and grants summary judgment in favor of Plaintiff on the breach-of-guaranty claim.

### 1.     The Ascentium Financing

Plaintiff contends that the Ascentium Financing, by which Borrower obtained a lien without the consent of Plaintiff or its predecessor, is a Springing Recourse Event. Doc. 23, Pl.'s Br., 8, 23. Defendants do not dispute whether the Ascentium Financing involved an unauthorized lien on property subject to the Loan Agreement. *See* Doc. 30, Defs.' Resp., 10–11. Rather, Defendants challenge Plaintiff's ability to rely upon the Ascentium Financing as a Springing Recourse Event by arguing that: (1) treating the Ascentium Financing as a Springing Recourse Event violates public policy; and (2) the line of credit associated with the Ascentium Financing was paid in full, and its accompanying lien was released, on September 18, 2020. Doc. 30, Defs.' Resp., 10.

As explained below, the Court rejects both arguments and concludes Defendants failed to raise a genuine issue of material fact regarding whether a Springing Recourse Event occurred and triggered Defendants' obligation under the Guaranty.

First, Defendants contend that the Ascentium Financing was an attempt to keep the Hotel afloat amidst the COVID-19 pandemic, and that the federal government has evinced a policy to help

---

[6] The Court thus need not address the Sterling Lien.

small businesses reopen through the passage of legislation. Doc. 30, Defs.' Resp., 8–9. Consequently, Defendants argue, enforcing the Guaranty based on the Ascentium Financing "is against the dominant public policy of the United States . . . ." *Id.* at 9–10 (citing *Muschany v. United States*, 324 U.S. 49, 66 (1945)). But the only case Defendants cite in support of this argument is *Muschany*, where the Supreme Court declined to invalidate a contract entered by the United States War Department on public policy grounds. 324 U.S. at 64–67. The Supreme Court reasoned that without "a plain indication" of the policy at issue "through long governmental practice or statutory enactments," courts "must be content to await legislative action"—not invalidate contracts on their own accord. *See id.* at 66–67.

Following this guidance from *Muschany*, this Court will not refrain from enforcing the Guaranty based on public policy considerations. Notably, Defendants have cited no caselaw suggesting that enforcement of a guaranty agreement contravenes public policy in light of the COVID-19 pandemic. *See generally* Doc. 30, Defs.' Resp. Though the Court recognizes the economic hardship created by the pandemic, it must nonetheless enforce the Guaranty as written. Accordingly, Defendants' public policy argument does not create a genuine issue of material fact regarding whether Defendants have breached the Guaranty.

Second, Defendants contend that because the lien associated with the Ascentium Financing was released on September 18, 2020, due to full payment, "there is a genuine issue of material fact regarding whether Plaintiff has suffered any hardship or is entitled to any damages as result of the lien." *Id.* at 10–11. But Defendants have not explained why Plaintiff would need to demonstrate hardship or damages resulting from the lien associated with the Ascentium Financing. Under the Guaranty, Defendants are liable for the debt incurred under the Loan Agreement upon occurrence

of any Springing Recourse Event. Doc. 24, Pl.'s App., 143. And as Plaintiff points out and Defendants fail to contest, the Ascentium Financing constitutes a Springing Recourse Event under the plain terms of the Guaranty and the Loan Agreement because it was a non-permitted transfer and violated Section 5.12. *See* Doc. 23, Pl.'s Br., 14–15; Doc. 30, Defs.' Resp., 10–11; *supra* Section III.A (explaining what constitutes a Springing Recourse Event). Because Defendants have not shown how the subsequent payment of the lien is material to whether Defendants are liable under the Guaranty, the Court rejects their argument and concludes the Ascentium Financing triggered Defendants' obligations under the Guaranty. The Court thus **GRANTS** summary judgment in favor of Plaintiff on the breach-of-guaranty claim.

### 2.   The SBA Lien

Plaintiff also alleges that the SBA Lien is a Springing Recourse Event that triggers Defendants' liability under the Guaranty. Doc. 23, Pl.'s Br., 14–15. Defendants present two arguments in response: (1) again, they argue that the Court should not enforce the Guaranty based on a lien incurred to keep the Hotel in business amidst the COVID-19 pandemic; and (2) they contend that the SBA Lien is a Permitted Transfer. *See* Doc. 30, Defs.' Resp., 11–12. For the reasons explained above, the Court rejects the first argument, and for the reasons explained below, the Court rejects the second argument.

Defendants argue that the SBA Lien is not a Springing Recourse Event because it qualifies as a "[l]ien . . . for Taxes or other charges not yet due and payable and not delinquent," which is a Permitted Encumbrance—and thus a Permitted Transfer—under the Loan Agreement. *See* Doc. 30, Defs.' Resp., 11 (quoting Doc. 24, Pl.'s App., 32). Specifically, Defendants explain that no amount is due on the SBA Lien until July 10, 2021, and the full amount of principal and interest on the SBA

Lien is not due until 2050. Doc. 30, Defs.' Resp., 11. Defendants contend that because the SBA Lien is "not yet due and payable and not delinquent," it qualifies as a Permitted Transfer. *See id.* (quoting Doc. 24, Pl.'s App., 32).

The Court rejects this argument because Defendants have not created a genuine fact issue as to whether the SBA Lien is one "for Taxes or other charges . . . ." Doc. 24, Pl.'s App., 32. To qualify as a Permitted Encumbrance under the definition relied upon by Defendants, the lien must meet multiple criteria: it cannot be "due and payable" or "delinquent," *and* it must be "one for Taxes or other charges . . . ." *Id.* Defendants state that Borrower obtained the SBA Loan to use it "as working capital to alleviate economic injury cause[d] by" the COVID-19 pandemic. Doc. 30, Defs.' Resp., 11. As Plaintiff points out, *see* Doc. 32, Pl.'s Reply, 4–5, the plain meaning of "other charges" is not so broad as to "encompass a general loan and associated lien . . . ." *Id.* at 4. Indeed, Defendants wholly fail to explain how the SBA Lien could be one for "other charges." *See* Doc. 30, Defs.' Resp., 11–12. Defendants have thus failed to raise a genuine issue of material fact regarding whether the SBA Lien constitutes a Permitted Transfer rather than a Springing Recourse Event. Accordingly, the SBA Lien is another event triggering Defendants' obligations under the Guaranty and provides an additional basis for the Court's grant of summary judgment in favor of Plaintiff on the breach-of-guaranty claim.

### 3.    The LLC Transfer

Plaintiff contends that the LLC Transfer is another Springing Recourse Event under the Loan Agreement. Doc. 23, Pl.'s Br., 12. The Loan Agreement permits "a Transfer of an interest in Borrower to any Person," as long as "no Event of Default" exists at the time of the transfer and, among other requirements, the "Key Principal(s)" of Borrower continue "to own at least 51% of all

equity interests (direct or indirect) in Borrower" following the transfer. Doc. 24, Pl.'s App., 32. But outside of these parameters, the Loan Agreement does not permit a transfer of interests in Borrower. *See id.* at 32–33 (defining "Permitted Transfers"); *id.* at 63 ("Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer.").

Plaintiff provides evidence of the agreement memorializing the LLC Transfer, and it is signed by all owners of Borrower (Defendants and another individual), as well as DATD. *See id.* at 234–41. Indeed, Defendants admit that they "signed an agreement with DATD to" transfer "all membership interest[s]" to DATD on September 22, 2020. Doc. 31, Defs.' App., 9. Further, they provide evidence that DATD acknowledged the agreement, but then declared it "null and void at the outset and/or rescinded" as of November 30, 2020. *Id.* at 121.

Defendants do not contest whether a transfer of 100% of Borrower's membership interests in September 2020 constitutes a Springing Recourse Event under the Guaranty. *See* Doc. 30, Defs.' Resp., 14–15. Rather, Defendants assert that because DATD disputes whether the LLC Transfer was valid, there is a genuine issue of material fact regarding whether Borrower did indeed transfer its interests. *Id.* at 14.

The Court disagrees. The Loan Agreement defines "Transfer" to include:

> any . . . transfer . . . *or the entry into any agreement* to sell, convey, transfer, lease or assign, whether by law or otherwise . . . (i) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (ii) any direct or indirect interest in Borrower (including any profit interest), or (iii) the direct or indirect right or power to direct or cause the direction of the management and policies of Borrower . . . .

Doc. 24, Pl.'s App., 35 (emphasis added). Because Defendants entered an agreement to assign all ownership interests in Borrower to DATD—as evidenced by their signatures on the

- 13 -

agreement—their conduct is a Transfer under the Loan Agreement. Defendants do not point to any language in the Loan Agreement or the Guaranty suggesting that their entry into an agreement that is later contested as void or rescinded is exempt from the definition of "Transfer." *See* Doc. 30, Defs.' Resp., 14–15. Thus, Defendants do not create a genuine fact issue on whether the LLC Transfer was a Transfer under the Loan Agreement.

Further, this Transfer is a Springing Recourse Event triggering liability under the Guaranty. A "Springing Recourse Event" includes "an Event of Default described in Section 8.1(d)," and under Section 8.1(d), an "Event of Default" exists when "a Transfer other than a Permitted Transfer occurs[.]" Doc. 24, Pl.'s App., 81, 91. Defendants do not argue that the LLC Transfer is a Permitted Transfer under the Loan Agreement. Doc. 30, Defs.' Resp., 14–15. Accordingly, Defendants fail to create a genuine issue of material fact regarding whether the LLC Transfer constitutes a Springing Recourse Event. The LLC Transfer is thus a third basis for the Court's grant of summary judgment on the breach-of-guaranty claim.

<u>4.</u>     <u>Defendants' "Affirmative Defenses"</u>

Defendants assert five "affirmative defenses" in their answer: (1) "Borrower did not breach the Loan Documents in any way leading to liability under the Guaranty"; (2) "Defendants have not breached the Guaranty"; (3) "Any lien, loan, or other encumbrance on the Property was not a default as it was permitted under the terms of the Loan Documents and/or public policy, was under genuine dispute or was otherwise timely cured"; (4) the LLC Transfer "was rescinded, ineffective, and as such no transfer occurred"; and (5) "Any liability found against Defendants under the Guaranty is subject to indemnity by" DATD due to the LLC Transfer. Doc. 8, Answer, ¶¶ 101–05.

As a preliminary matter, Defendants have not explained how these assertions constitute

affirmative defenses rather than simple contentions against liability. In any event, the Court found no genuine issue of material fact regarding whether Defendants are liable under the Guaranty due to the Ascentium Financing, the SBA Lien, and the LLC Transfer. *See supra* Sections III.A.1–3. And Plaintiff provides undisputed evidence that Defendants have not paid any amount owed under the Guaranty. Doc. 24, Pl.'s App., 11. Thus, even if the Court treats Defendants' first four points as affirmative defenses, Defendants fail to raise a genuine issue of material fact on any of these defenses.

Finally, the last "affirmative defense" is Defendants' claim to indemnity by DATD. Doc. 8, Answer, ¶ 104. But Defendants fail to cite any authority suggesting that Defendants' right to indemnity from a third party negates Defendants' liability to Plaintiff. Indeed, Ohio law recognizes claims for indemnification *after* the party claiming indemnity has incurred damages. *See, e.g.*, *CSX Transp., Inc. v. Columbus Downtown Dev. Corp.*, 307 F. Supp. 3d 719, 728 (S.D. Ohio 2018).[7] In fact, the Court previously recognized Defendants' claim to indemnity as a claim for affirmative relief by permitting Defendants to file a third-party complaint against DATD. *See* Doc. 25, Mem. Op. & Order, 9.

Accordingly, Defendants have not shown that there is a genuine issue of material fact regarding any claimed affirmative defense. *See, e.g.*, *Fed. Debt Mgmt., Inc. v. Herbst Res., Inc.*, 15 F.3d 179, 1994 WL 24890, at *2 (5th Cir. 1994) (per curiam) ("[W]here the non-movant bears the burden of proof at trial on a dispositive issue, the non-movant must demonstrate by competent summary judgment proof that there is a genuine issue of material fact warranting trial." (citation

---

[7] Likewise, Florida law, which governs Borrower's agreement with DATD, *see* Doc. 24, Pl.'s App., 236, recognizes a claim for breach of an indemnity provision. *Sutherlin v. Wells Fargo & Co.*, 297 F. Supp. 3d 1271, 1278 (M.D. Fla. 2018).

omitted)).

B.    *The Court Grants Plaintiff Leave to File a Supplemental Affidavit but Denies Summary Judgment on the Issue of Actual Damages.*

In its motion for summary judgment, Plaintiff seeks $7,696,511.92 in actual damages as of April 5, 2021. Doc. 23, Pl.'s Br., 18–19.

However, after its motion was fully briefed, Plaintiff filed an opposed motion for leave to file a supplemental affidavit correcting this amount to $7,502,300.62 based on an error in the initial affidavit submitted in support of its motion ("the Levin Affidavit"). Doc. 33, Mot. for Leave, 1–2. Specifically, the proposed supplemental affidavit ("the Supplemental Levin Affidavit") states that the Levin Affidavit miscalculated the amount due for "property protection advances[.]" Doc. 33-1, Suppl. Aff., 2. The Court **GRANTS** Plaintiff's motion for leave to file the Supplemental Levin Affidavit, as this affidavit attempts to correct an error in a manner that benefits Defendants.

Considering all of the summary-judgment evidence, along with the Supplemental Levin Affidavit, the Court now turns to Defendants' arguments as to why Plaintiff is not entitled to summary judgment on the issue of damages. Ultimately, the Court concludes that due to inconsistency between the Levin Affidavit and the Supplemental Levin Affidavit, it must deny summary judgment on the issue of damages.

Defendants first assert that Plaintiff's calculation of the principal and interest due under the Loan Agreement is "inflated since Borrower has been under cash management since June 2020, and Plaintiff has not applied the reserves under its control to the principal amount." Doc. 30, Defs.' Br., 16. In response, Plaintiff points out that the Levin Affidavit, which is an affidavit from a custodian of records for the servicer of the Loan, indicates "that only $0.28 remains in the Loan reserves" and

that this $0.28 was credited to the balance on the Loan. Doc. 32, Pl.'s Reply, 10–11; *see* Doc. 24, Pl.'s App., 2, 9. The Levin Affidavit also states that "Plaintiff has used some of the funds . . . to pay a portion of the accelerated Loan balance." Doc. 24, Pl.'s App., 12.[8]

Defendants' argument regarding the loan reserves fails to create a genuine issue of material fact regarding the amount due. As Plaintiff points out, because Borrower was in default when the Cash Management period began, "Plaintiff had complete discretion under Section 3.10 of the Loan Agreement as to how to apply" the funds at issue. *See* Doc. 23, Pl.'s Br., 6–7, 17. Specifically, Section 3.10 states that "after the occurrence of an Event of Default, [Plaintiff] may apply all Rents deposited into the Deposit Account and other proceeds of repayment in such order and in such manner as [Plaintiff] shall elect." Doc. 24, Pl.'s App., 48. Defendants do not dispute this interpretation of the Loan Agreement—rather, they argue only that "Plaintiff should not be rewarded for its gamesmanship by forcing Defendants to be liable for an artificially increased principal and interest amount[.]" Doc. 30, Defs.' Resp., 16. Thus, Defendants have not shown how any purported factual dispute regarding application of the loan reserves is material.

Next, Defendants contend that under the "one satisfaction rule," "any monetary damages to be recovered against Defendants in this lawsuit must be reduced by the value of any proceeds Plaintiff receives from the hotel following its foreclosure." *Id.* at 18–19. But the one-satisfaction rule bars Plaintiff from *recovering* the amount owed from both the foreclosure sale and Defendants—it has no bearing on whether Plaintiff may obtain a judgment against Defendants. *See, e.g.*, *Huntington*

---

[8] Plaintiff further asserts that its evidence of "the Loan History shows all payments and credits made and how they were applied to the Loan balance, including Plaintiff's application of substantially all of the loan reserves." Doc. 32, Pl.'s Reply, 10. But Plaintiff fails to explain how the Loan History, *see* Doc. 24, Pl.'s App., 264–71, supports this proposition.

*Nat'l Bank v. G.J.P. Props., L.L.C*, 2014 WL 200920, at *1, *5 (Ohio Ct. App. Jan. 16, 2014) (rejecting argument that trial court erred in entering judgment against both a guarantor and debtor for the same amount but acknowledging that the plaintiff "can collect only one amount"). Here, Defendants produced no evidence that Plaintiff has recovered any proceeds from the foreclosure. Accordingly, Defendants' argument fails to create a genuine issue of material fact on damages.

Finally, Defendants contend that Plaintiff does not "provide any receipts, accounting, documentation, or calculation" to support the claimed amounts for "'late fees,' 'non-legal fees,' 'property protection advances,' 'tax advances,' 'yield maintenance,' and a 'liquidation fee[.]'" Doc. 30, Defs.' Resp., 16 (quoting Doc. 24, Pl.'s App., 265). Defendants state that though the Levin Affidavit details these amounts based on the Loan History, the Loan History "does not account for" these sums. *Id.* Consequently, Defendants argue that under the best-evidence rule, Plaintiff may not rely solely on the Levin Affidavit and accompanying Loan History to prove its damages. *Id.* at 17.

Plaintiff, on the other hand, states it has provided a business-records affidavit—the Levin Affidavit—to support its damages calculation. Doc. 32, Pl.'s Reply, 8–9. Further, Plaintiff asserts Defendants have not challenged "the factual accuracy of [the] calculations" presented in the affidavit or the affiant's "adequacy as a business records custodian[.]" *Id.* at 10. Finally, according to Plaintiff, to the extent that Defendants believe they need more information to calculate damages, "they had the burden of submitting an affidavit . . . demonstrating that they cannot present facts essential to justify their opposition to Plaintiff's damages calculation." *Id.*

As an initial matter, under Ohio law, an affidavit can provide sufficient evidence of the amount due under a loan agreement. *See, e.g., Fifth Third Mortg. Co. v. Fantine*, 2015 WL 5968101, at *4 (Ohio Ct. App. Oct. 9, 2015) ("Ohio courts have held an averment of outstanding

- 18 -

indebtedness made in the affidavit of a bank loan officer with personal knowledge of the debtor's account is sufficient to establish the amount due and owing on the note, unless the debtor refutes the averred indebtedness with evidence that a different amount is owed." (citation and quotation marks omitted)).

Nevertheless, in light of the inconsistency created by the Supplemental Levin Affidavit, there is a genuine issue of material fact regarding the amount owed by Defendants. *See RBC Real Est. Fin., Inc., v. Partners Land Dev., Ltd.*, 543 F. App'x 477, 479–80 (5th Cir. 2013) (per curiam) (distinguishing between reliance on an affidavit when the plaintiff's summary-judgment evidence contained "inconsistencies" regarding the amount due under a note as opposed to reliance on an affidavit when the plaintiff's evidence created no such inconsistencies).[9] Namely, the Levin Affidavit and the Supplemental Levin Affidavit are inconsistent with respect to the "property protection advances" category, even though both affidavits purport to be "[b]ased on the data in the Servicing System," which, in turn, is memorialized in the Loan History. Doc. 33-1, Suppl. Aff., 3; Doc. 24, Pl.'s App., 9–10. Further, upon an independent review of the Loan History, the Court is unable to discern whether Plaintiff's calculations for the remaining fees owed, which are also purportedly based on the Loan History, are accurate. Given the inconsistency in the evidence and the Court's inability to verify the amounts due under the Guaranty based on Plaintiff's evidence, Plaintiff has not established its claimed actual damages "beyond peradventure[.]" *See Altec*, 2013 WL 866193, at *2. The Court thus **DENIE**S summary judgment on the issue of damages.

---

[9] In *RBC*, the Fifth Circuit applied Texas law. *Id.* at 479. But Texas law, like Ohio law, permits a lender to prove damages by submitting a bank employee's affidavit, so the reasoning of *RBC* remains relevant. *See id.* at 479 (citations omitted).

C.      *The Court Denies Summary Judgment on the Issue of Attorneys' Fees.*[10]

To determine attorneys' fees, Ohio courts employ the "lodestar method." *Western-Southern Life Assurance Co. v. Kaleh*, 879 F.3d 653, 665 (5th Cir. 2018) (citation omitted) (applying Ohio law). Accordingly, under Ohio law, the Court must "determine[] the amount of a reasonable fee by examining the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate, subject to a host of modifying factors." *Id.* (citation and quotation marks omitted). "Courts calculate the reasonable hourly rate based on the prevailing market rate in the relevant community for lawyers of comparable skill and experience; out-of-town lawyers thus may only recover the rate they would command in the local market." *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 849 (6th Cir. 2013) (citation and quotation marks omitted). "The party seeking attorney's fees bears the burden of establishing entitlement to an award . . . ." *Id.* at 848 (citations and quotation marks omitted).

Plaintiff seeks $62,964.78 in attorneys' fees and costs. Doc. 23, Pl.'s Br., 32. In support of its request, Plaintiff submitted an affidavit ("the Gold Affidavit") from David Gold, one of Plaintiff's attorneys, and a time sheet from Plaintiff's attorneys. *See* Doc. 24, Pl.'s App., 273–74 (listing attachments to the Gold Affidavit). In the Gold Affidavit, Gold sets forth the billing rate for each attorney on Plaintiff's case, as well as where each attorney is licensed. Gold explains that "[b]ased on [his] experience," each rate is reasonable based on the attorney's seniority and experience. *See id.* at 274–75. The time sheet details the 98.30 hours spent on the case, as well as the $1,235.28 of

---

[10] The Court must analyze Plaintiff's request for attorneys' fees under Ohio law. *See Exxon Corp. v. Burglin*, 4 F.3d 1294, 1302 (5th Cir. 1993) ("[I]n litigation construing a contract that contains a valid choice of law clause, the parties' choice of law governs both the interpretation of the contract and the award of attorneys' fees." (citation omitted)).

costs incurred in prosecuting this action. *Id.* at 315–16.

Defendants contend that Plaintiff has not provided competent summary-judgment evidence demonstrating that Plaintiff's attorneys' fees request was reasonable. Doc. 30, Defs.' Resp., 17.[11] In support, Defendants point out that Plaintiff has not designated its attorney, "or anyone else, as a witness or an expert witness to testify regarding attorney's fees." *Id.* Consequently, Defendants ask the Court to strike the Gold Affidavit. *Id.* at 18.

The Court denies Defendants' request, as Plaintiff's failure to designate an expert on the issue of attorneys' fees is not necessarily fatal to its claim for attorneys' fees. The Court is unaware of any authority prohibiting a party from offering an affidavit in support of the reasonableness of a request for attorneys' fees. "In fact, in Ohio there is no steadfast rule that the 'reasonableness' of attorney fees must be proved by expert testimony." *Cleveland v. Capitalsource Bank*, 2016 WL 3018565, at *2 (Ohio Ct. App. May 26, 2016) (citation omitted).

Nonetheless, upon review of Plaintiff's attorneys' fees request, the Court concludes Plaintiff has not met its burden of proving the reasonableness of its request. Specifically, though Plaintiff has detailed the time spent on this case, it has not convinced the Court that the attorneys' hourly rates are reasonable for the Dallas market. For example, three of the most experienced attorneys charge $650-to-$800 per hour. *See* Doc. 24, Pl.'s App., 274. Gold's conclusory assertions in his affidavit fail to convince the Court that these steep billing rates are reasonable. *Cf. Sw. Reinsure, Inc. v. Comfort*

---

[11] Defendants do not contest that the Guaranty permits Plaintiff to recover attorneys' fees. *See generally* Doc. 30, Defs.' Resp., 17–18; *see* Doc. 24, Pl.'s App., 151 ("Guarantor hereby agrees to pay all actual, out-of-pocket costs, charges and expenses, including reasonable attorneys' fees and disbursements, which may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantor under this Guaranty.").

*Auto Grp. USA, LLC*, 2021 WL 2414847, at *4 & n.4 (N.D. Tex. June 4, 2021) (finding billing rates reasonable in a guaranty enforcement case where the partner with the highest billing rate billed $450 per hour). Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment to the extent Plaintiff seeks summary judgment on the issue of attorneys' fees.

## IV.

## CONCLUSION

For the reasons explained above, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment (Doc. 22). Moreover, the Court **GRANTS** Plaintiff's motion for leave to file a supplemental affidavit (Doc. 33).

SO ORDERED.

SIGNED: August 11, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE